HYDEE FELDSTEIN SOTO (SBN 106866)
City Attorney
VALERIE FLORES (SBN 138572)
Chief Assistant City Attorney
MELANIE A. TORY (SBN 252387)
Assistant City Attorney
NICHOLAS J. Karno (SBN 210805)
Deputy City Attorney
221 North Figueroa Street, Suite 1000
Los Angeles, CA 90012
Tel: (213) 367-4500
Email: melanie.tory@ladwp.com
Email: nick.karno@ladwp.com

WILLIAM D. MARSH (SBN 200082)
THOMAS A. BLOOMFIELD (SBN 163533)
KAPLAN KIRSCH, LLP
One Sansome Street, Suite 2250
San Francisco, CA 94104
Tel: (415) 907-8704
Email: wmarsh@kaplankirsch.com
Email: tbloomfield@kaplankirsch.com

*Attorneys for Plaintiff The City of Los Angeles*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

The City of Los Angeles, a California municipal corporation, acting by and through its Department of Water and Power,

*Plaintiff*,

v.

Masco Corporation, a Delaware corporation; California Technical Plating, LLC, a Delaware limited liability company; Partner Companies, LLC, a Delaware limited liability company; M&S Diamond, LLC, a California limited liability company; Scott Bekemeyer; Dan Brumlik; Charles Cohen; and DOES 1 through 100, inclusive.

*Defendants*.

Case No. 2:26-CV-11262

COMPLAINT FOR:

1) CERCLA COST RECOVERY (42 U.S.C. § 9607);
2) DECLARATORY RELIEF (42 U.S.C. § 9613);
3) CONTINUING TRESPASS;
4) CONTINUING PUBLIC NUISANCE (CIV. CODE §§ 3479, 3480, 3494, CODE CIV. PROC. 731);
5) CONTINUING NEGLIGENCE; and
6) NEGLIGENCE PER SE

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") sections 107, 113(b), and 113(g), 42 U.S.C. §§ 9607, 9613(b), and 9613(g). The Court has jurisdiction over the California law claims under 28 U.S.C. § 1367 (supplemental jurisdiction) and its pendent jurisdiction.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), CERCLA, 42 U.S.C. § 9613(b) because the releases of hazardous substances that give rise to Plaintiff's claims occurred in this district, the groundwater at issue is within this district, and a substantial part of the events or omissions which give rise to Plaintiff's claims occurred within this district.

## GENERAL ALLEGATIONS

3. Plaintiff The City of Los Angeles, acting by and through its Department of Water and Power (hereinafter, "LADWP"), brings this action against Masco Corporation, a Delaware corporation, ("Masco"), California Technical Plating, LLC, a Delaware limited liability company ("Cal Tech"), Partner Companies, LLC, a Delaware limited liability company ("Partner"), M&S Diamond, LLC ("M&S"), the individuals Scott Bekemeyer, Dan Brumlik, Charles Cohen, and DOES 1 through 100 (collectively, the "Defendants") to recover response costs and damages and to obtain a declaration of liability for future response costs and damages that LADWP has incurred and will continue to incur to address groundwater contamination, which was caused or contributed to by the actions and omissions of Defendants and their corporate predecessors. LADWP seeks relief under CERCLA, 42 U.S.C. §§ 9601, *et seq.*, and California law.

4. LADWP possesses valuable Pueblo water rights within the San Fernando Basin ("Basin") in California, which were adjudicated in 1979 in *The City of Los Angeles v. City of San Fernando*, Los Angeles Superior Case No.

650079. The Basin consists of 112,000 acres and is an important source of drinking water. Historically, groundwater from the Basin has provided approximately 14 percent of the City of Los Angeles' total water supply, on average, and nearly 30 percent in drought years, when imported water has been less reliable.

5. The contamination of groundwater in the Basin with Hazardous Substances (as defined below) and other chemicals has forced the closure of many drinking water supply wells. This has impacted LADWP's ability to fully utilize its groundwater rights, forcing LADWP to install costly water treatment systems, pump more water from wells outside the Basin, and purchase imported water.

6. LADWP has nine major well fields that pump groundwater from the Basin: Tujunga, Crystal Springs, Headworks, Rinaldi-Toluca, North Hollywood West, North Hollywood East, Verdugo, Whitnall, and Pollock. The subject of this action, the Tujunga Well Field, includes 12 groundwater wells that were installed between 1988 and 1991.

7. Hazardous Substances and other contaminants have been detected in the groundwater at the Tujunga Well Field at levels that required LADWP to investigate and remediate such substances.

8. As a result of the presence of Hazardous Substances in the groundwater at the Tujunga Well Field, LADWP has incurred, and will continue to incur, millions of dollars in Response Costs (as defined below) to treat the groundwater at the Tujunga Well Field Response Action Treatment Facility.

9. As set forth more fully below, Defendants are jointly and severally liable for the Response Costs incurred by LADWP due to the presence of Hazardous Substances at the Tujunga Well Field that migrated in the groundwater from upgradient properties, for which Defendants are responsible.

**DEFINITIONS**

10. "Tujunga Well Field" shall mean the area that includes the groundwater and groundwater wells that comprise the Tujunga Well Field Response Action Treatment Facility, located generally at 8801 Arleta Avenue in Pacoima, California, that is owned and operated by LADWP, where LADWP will, among other things, operate groundwater wells for the capture and remediation of groundwater from the Basin.

11. "COCs" shall mean contaminants of concern including, but not limited to, volatile organic compounds ("VOCs"), trichloroethene ("TCE"), tetrachloroethene ("PCE"), 1,1,1-Trichloroethane ("TCA"), 1,4-dioxane, and hexavalent chromium.

12. "Disposal(s)" shall have the meaning set forth in CERCLA, 42 U.S.C. § 9601(29) as "the discharge, deposit, injection, dumping, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the Environment or be emitted into the air or discharged into any waters, including ground waters."

13. "Release(s)" shall have the meaning set forth in CERCLA, 42 U.S.C. § 9601(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, or disposing into the Environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)."

14. "Hazardous Substance(s)" shall have the meaning set forth in CERCLA, 42 U.S.C. § 9601(14), which includes:

(A) "any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. § 1321(b)(2)(A)]";

(B) "any element, compound designated pursuant to [CERCLA, 42 U.S.C.] section 9602";

(C) "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921]";

(D) "any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. § 1317(a)]";

(E) "any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412]"; and

(F) "any imminently hazardous chemical substance or mixture with respect to which the [United States Environmental Protection Agency ("EPA")] Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. § 2606]."

15. "Environment" shall have the meaning set forth in CERCLA, 42 U.S.C. § 9601(8), which includes "any . . . surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States."

16. "Facility" shall have the meaning set forth in CERCLA, 42 U.S.C. § 9601(9), which includes "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

17. "National Contingency Plan" ("NCP") means the National Oil and Hazardous Substance Pollution Contingency Plan, as set forth in 40 C.F.R. Part 300.

18. "Response Costs" means the costs of "removal" and "remedial action" of Hazardous Substances, as those terms are defined in CERCLA, 42 U.S.C. §§

9601(23), (24), and all other costs necessary to respond to a Release of Hazardous Substances, as defined in 42 U.S.C. § 9601(25), and all other applicable laws.

## PLAINTIFF

19. LADWP is a proprietary department of The City of Los Angeles, a charter city organized under the laws of the State of California. Among its other functions, LADWP provides municipal water and power to approximately four million residents and businesses. LADWP provides a reliable supply of potable water for beneficial uses, as defined in the Los Angeles Regional Water Quality Control Basin Plan and for the coastal watersheds of Los Angeles and Ventura Counties.

## DEFENDANTS

20. Masco is a Delaware corporation that is the legal successor to liabilities associated with the "Price-Pfister Facility," as defined below.

21. Cal Tech is a Delaware limited liability company that is the legal successor to, and continuation of the same business as California Technical Plating, Inc., and is responsible for liabilities associated with the "Cal Tech Plating Facility," as defined below.

22. Partner is a Delaware limited liability company that, on information and belief, is the legal successor to, and continuation of the same business as Cal Tech and California Technical Plating, Inc., and is responsible for liabilities associated with the "Cal Tech Plating Facility," as defined below.

23. Scott Bekemeyer, Dan Brumlik, and Charles Cohen are members of Cal Tech and Partner, and on information and belief, directed and managed Cal Tech and Partner such that they are the alter ego of such entities and responsible for the liabilities associated with the "Cal Tech Plating Facility," as defined below.

24. M&S is a California limited liability company that is the owner of portions of the "American Etching Facility," as defined below.

25. LADWP is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1-100, inclusive, and therefore sues said defendants under fictitious names. LADWP will amend this Complaint to show their true names and capacities when the same have been ascertained.

**THE RESPONSE ACTION**

26. In response to releases and threatened releases of Hazardous Substances affecting groundwater in the Tujunga Well Field, LADWP prepared and published a Remedial Investigation and Feasibility Study ("RI/FS"), Community Involvement Plan, Baseline Risk Assessment, and Proposed Plan in a manner consistent with the NCP.

27. The RI/FS evaluated the nature and extent of contamination affecting the Tujunga Well Field, the migration of Hazardous Substances in groundwater, and the risks posed by Releases and threatened Releases of Hazardous Substances to public health, drinking water supply, and the Environment.

28. LADWP made the RI/FS, Proposed Plan, and supporting documents available for public review during the public comment period.

29. LADWP held a public comment period on the RI/FS, Proposed Plan, and related NCP documents from July 13, 2018, through September 12, 2018, including a 30-day extension.

30. On July 26, 2018, LADWP held a public meeting at which it presented information concerning the RI/FS, Proposed Plan, and related documents and accepted public comments.

31. After the close of the public comment period, LADWP considered the public comments, prepared a summary of the comments received during the public comment period, and published a Responsiveness Summary.

32. In January 2019, the LADWP Board of Commissioners selected the interim remedial action ("IRA") for the Tujunga Well Field through an Interim

Remedial Action Decision ("IRAD"), in accordance with CERCLA and the NCP. The Tujunga IRA was selected as an interim action to address contamination affecting the Tujunga operable unit while preserving LADWP's ability to take additional response actions as necessary.

33. In connection with its evaluation and selection of the response actions, LADWP convened a technical advisory committee ("TAC") comprised of state regulatory agencies, including the Los Angeles Regional Water Quality Control Board ("RWQCB"), the California Department of Toxic Substances Control ("DTSC"), and the California State Water Resources Control Board, including its Division of Drinking Water ("DDW") and Division of Financial Assistance ("DFA"), with the EPA serving in an advisory capacity.

34. LADWP consulted with the TAC during preparation of the Tujunga Interim RI/FS, the Proposed Plan, and related NCP documents.

35. The selected interim remedial action is a groundwater pump-and-treatment system intended to reduce the toxicity, mobility, and volume of contaminated groundwater. The remedy is designed to protect public health, drinking water supply, and the Environment, including human health, by capturing and removing contaminated groundwater from the Tujunga operable unit through hydraulic control, treating the captured groundwater aboveground to remove COCs and other contaminants, and restoring the beneficial use of groundwater in accordance with the Los Angeles Regional Water Quality Control Board Basin Plan.

36. Hydraulic control will draw contaminated groundwater toward the remediation wells and away from other groundwater production wells within the Tujunga Well Field and downgradient groundwater resources. By capturing contaminated groundwater, hydraulic control will reduce the likelihood that COCs will impact other groundwater production wells within the Tujunga Well Field or downgradient groundwater resources. Captured groundwater will be managed

aboveground through a combination of institutional and treatment actions, including bypass operations, alternative pumping plans, monitoring, and groundwater use restrictions.

37. Treatment actions will include aboveground treatment of groundwater impacted by COCs, including, but not limited to, TCE, PCE, TCA, and 1,4-dioxane, in compliance with applicable or relevant and appropriate requirements and criteria to be considered to protect human health. Treatment will include advanced oxidation process ("AOP") technology to transform 1,4-dioxane, TCE, and PCE into innocuous byproducts. Granular activated carbon will be used to remove remaining hydrogen peroxide downstream of the AOP and to provide additional VOC and contaminant removal. The blended and treated groundwater will be conveyed to LADWP's potable water distribution system for direct domestic use.

38. LADWP's response actions, including investigation, sampling, modeling, engineering, design, permitting, public participation, construction, operation, maintenance, monitoring, agency coordination, and related technical and legal work, were and are necessary response actions to address releases and threatened releases of Hazardous Substances affecting the Tujunga Well Field.

39. LADWP substantially complied with the NCP in evaluating, selecting, and implementing the IRA , including thorough investigation of site conditions, evaluation of remedial alternatives, public participation, and preparation of a responsiveness summary.

40. On-site physical construction of the selected remedy in the IRAD began on or after November 23, 2020.

41. LADWP has incurred more than $290 million in Response Costs to investigate, design, permit, and construct the selected remedy in the IRAD, and will continue to incur additional Response Costs to complete construction, secure necessary approvals, and operate and maintain the remedy, including future

necessary Response Costs for operation, maintenance, monitoring, permitting, and additional response actions as conditions warrant.

42. LADWP is currently in the process of securing an amendment to its drinking water permit that will authorize delivery of the treated groundwater into LADWP's potable water distribution system in a manner that protects public health.

## SPECIFIC ALLEGATIONS

### Price-Pfister Facility

43. The Price-Pfister Facility is generally located at 11071 Sutter Avenue and 13500, 13510, 13520, 13530, and 13550 Paxton Street in Pacoima, California, upgradient from the Tujunga Well Field.

44. Price Pfister Brass Manufacturing Company ("PF Brass") was incorporated in approximately 1946, when it began using the Price-Pfister Facility for various metalworking activities, including metal machining, fabrication, foundry, and polishing operations, primarily to produce plumbing supplies.

45. PF Brass' operations involved the use of Hazardous Substances that PF Brass caused to be released into the Environment, including into the groundwater underlying the Price-Pfister Facility.

46. The Releases of Hazardous Substances from the Price-Pfister Facility continue to this day and it is a continuing source of Hazardous Substances at the Tujunga Well Field.

47. PF Brass was acquired and merged with several companies such that PF Brass became a wholly-owned subsidiary of Norris Industries, Inc. ("Norris"). Norris' parent corporation, Norris-NI Industries, Inc., acquired PF Brass's liabilities associated with the Price-Pfister Facility. Norris-NI Industries, Inc. later changed its name to NI Industries, Inc., which remained the legal successor to the liabilities associated with the Price-Pfister Facility.

48. In 1983, Price-Pfister, Inc. ("Price-Pfister") was incorporated in Delaware and it purchased certain assets from NI Industries, Inc., including the Price-Pfister Facility. This 1983 transaction did not absolve NI Industries, Inc. of its liabilities associated with the Price-Pfister Facility.

49. In January 1985, Masco created a new subsidiary, Nimas Corporation, for the purpose of effectuating Masco's purchase of NI Industries, Inc. That same month, Nimas Corporation purchased NI Industries, Inc. as Nimas's subsidiary.

50. Just a few weeks later, Masco purchased NI Industries, Inc. from Nimas Corporation (as its own subsidiary). As part of that sale, on information and belief, Masco expressly assumed NI Industries, Inc.'s assets and liabilities associated with the Price-Pfister Facility.

51. Masco remains the legal successor to NI Industries, Inc.'s liabilities at the Price-Pfister Facility.

52. From the 1980s to the 2000s, soil and groundwater sampling was conducted at the Price-Pfister Facility under the oversight of the RWQCB and DTSC. Those sampling efforts revealed, among other things, elevated levels of Hazardous Substances in the soil and groundwater, including PCE, TCE, TCA, 1,4-dioxane, and hexavalent chromium.

53. The Price-Pfister Facility is located in the Basin, upgradient from the portion of the Basin from which the Tujunga Well Field captures water. The groundwater in the Basin flows southwest, meaning that Hazardous Substances released at the Price-Pfister Facility have migrated to the Tujunga Well Field and are continuously polluting the groundwater and surrounding soil.

**American Etching Facility**

54. The American Etching Facility is generally located at 13720-13724 and 13730-13736 Desmond Street in Pacoima, California, upgradient from the Tujunga Well Field.

55. American Etching & Manufacturing ("AEM") began operating at the American Etching Facility in approximately 1973. AEM's operations included the production of photochemically etched metal parts and components used in the electronic packaging, computer components, satellite, aerospace, and military technology industries. AEM created its products from several kinds of metal sheets, including iron, nickel, copper, zinc, tin, chromium, molybdenum, silver, aluminum, and beryllium.

56. AEM's chemical etching process used Hazardous Substances, including TCE and PCE, to degrease and prepare metal sheets at the start of the process. In addition, Hazardous Substances were used to "develop" the metal sheets prior to etching. Following etching, Hazardous Substances were used to clean and finish the metal end product in a process called "stripping."

57. AEM also stored large supplies of Hazardous Substances including, but not limited to, a drum storage area and a 3,000-gallon underground storage tank that was used for waste VOCs, including TCE, PCE, and TCA. AEM also stored and used 55-gallon drums of TCA, TCE, PCE, and other VOCs.

58. AEM's operations resulted in Releases of Hazardous Substances into the Environment, including into the soil and groundwater underlying the American Etching Facility.

59. The American Etching Facility is located in the Basin, upgradient from the portion of the Basin from which the Tujunga Well Field captures water. The groundwater in the Basin flows southwest, meaning that Hazardous Substances released at the American Etching Facility have migrated to the Tujunga Well Field and are continuously polluting the groundwater and surrounding soil.

60. The Releases of Hazardous Substances from the American Etching Facility continue to this day and it is a continuing source of Hazardous Substances at the Tujunga Well Field.

61. M&S is the owner of a portion of the property that previously comprised the American Etching Facility. M&S has not addressed the migration of Hazardous Substances from the American Etching Facility that is a continuing source of Hazardous Substances at the Tujunga Well Field.

**Cal Tech Plating Facility**

62. The Cal Tech Plating Facility is generally located at 11533-11535 Bradley Avenue in Pacoima, California, upgradient from the Tujunga Well Field.

63. California Technical Plating, Inc. operated a metal and Teflon plating business at the Cal Tech Plating Facility from approximately 1966 to 2014 when it purportedly sold the business to Cal Tech. During this period, there were Releases of Hazardous Substances at the Cal Tech Plating Facility.

64. Cal Tech continued operating a metal and Teflon plating business at the Cal Tech Plating Facility from approximately 2014 to 2026. During this period, there were Releases of Hazardous Substances at the Cal Tech Plating Facility.

65. On information and belief, Cal Tech assumed the liabilities and continued in the same business of California Technical Plating, Inc. such that it was a de facto merger between the two entities.

66. Scott Bekemeyer, Dan Brumlik, and Charles Cohen are members of Cal Tech and, on information and belief, directed and managed Cal Tech such that they are the alter ego of Cal Tech and responsible for the liabilities associated with the Cal Tech Plating Facility.

67. On information and belief, BBD Affiliates, LLC ("BBD") assumed operational control, including the environmental management of the Cal Tech Plating Facility, from approximately 2017 to 2020. During this period, there were Releases of Hazardous Substances at the Cal Tech Plating Facility.

68. On information and belief, BBD merged into Partner and Partner assumed the liabilities of BBD. Since then, Partner has answered for the debts and liabilities of Cal Tech and is its alter ego. During this period, there were Releases of Hazardous Substances at the Cal Tech Plating Facility.

69. Scott Bekemeyer, Dan Brumlik, and Charles Cohen are members of Partner and, on information and belief, directed and managed Partner such that they are the alter ego of Partner and responsible for the liabilities associated with the Cal Tech Plating Facility.

70. During its operations, the Cal Tech Plating Facility was issued notices of violations and subject to regulatory orders regarding the improper disposal of Hazardous Substances, and the operations at the Facility resulted in the Release and Disposal of Hazardous Substances (including PCE) into the Environment, including into the groundwater underlying the Cal Tech Plating Facility.

71. The Cal Tech Facility is located above the groundwater Basin that is contiguous with the Basin from which the Tujunga Well Field captures water. The groundwater in the Basin flows southwest, meaning that Hazardous Substances released at the Cal Tech Facility have migrated to the Tujunga Well Field and are continuously polluting the groundwater and surrounding soil.

72. The Releases of Hazardous Substances from the Cal Tech Facility continue to this day and it is a continuing source of Hazardous Substances at the Tujunga Well Field.

## FIRST CLAIM FOR RELIEF

### (Cost Recovery Pursuant to CERCLA, 42 U.S.C. § 9607(a))

73. LADWP incorporates by reference the allegations in Paragraphs 1 through 72 above.

74. LADWP and Defendants are each a "person" within the meaning of CERCLA, 42 U.S.C. § 9601(21).

75. The Price-Pfister Facility, the American Etching Facility, and the Cal Tech Plating Facility (collectively, the "Defendants' Facilities") are each a Facility under CERCLA, 42 U.S.C. § 9601(9).

76. There has been a Release or threatened Release of Hazardous Substances from Defendants' Facilities, and Hazardous Substances have come to be located in the groundwater at, beneath, and downgradient of Defendants' Facilities, including groundwater captured by or migrating toward the Tujunga Well Field.

77. Defendants are covered persons liable under CERCLA section 107(a), 42 U.S.C. § 9607(a), because Defendants are the owners and/or operators, or the legal successors to the liabilities of past owners and/or operators of the Defendants' Facilities at the time of Disposal of Hazardous Substances.

78. At the time of the Releases or Disposals of Hazardous Substances at or in connection with operations at the Defendants' Facilities, Defendants owned and/or operated a Facility or through their predecessors-in-interest, owned and/or operated a Facility, and/or is a current owner or operator of a Facility.

79. The disposal and/or release of Hazardous Substances at or in connection with operations at the Defendants' Facilities contaminated the groundwater at the Tujunga Well Field, which has caused LADWP and will continue to cause LADWP to incur Response Costs to contain, extract, and treat the contaminated groundwater.

80. LADWP's response actions were necessary to address the Release and threatened Release of Hazardous Substances at and from the Defendants' Facilities and were, are, and will continue to be taken in a manner consistent with the NCP pursuant to 40 C.F.R. Part 300.

81. The harm caused by the Releases and threatened Releases of Hazardous Substances from the Defendants' Facilities is indivisible. To the extent

Defendants contend that the harm is divisible or capable of apportionment, Defendants bear the burden of proving a reasonable basis for apportionment.

82. Under CERCLA, 42 U.S.C. § 9607(a), Defendants are strictly, jointly, and severally liable to LADWP for all necessary Response Costs that LADWP has incurred and will incur in responding to the Releases and threatened Releases of Hazardous Substances.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief Pursuant to CERCLA, 42 U.S.C. § 9613(g))

83. LADWP incorporates by reference the allegations in Paragraphs 1 through 82 above.

84. Based on the above, LADWP is entitled to a declaratory judgment under CERCLA, 42 U.S.C. § 9613(g)(2), declaring (A) that Defendants are jointly and severally liable for LADWP's future Response Costs and damages; and (B) that all Response Costs incurred by LADWP are consistent with the NCP.

85. LADWP further requests that this Court, after entering the declaratory judgment requested herein, retain jurisdiction of this action, pursuant to 28 U.S.C. § 2202, and grant LADWP such further relief against Defendants as is necessary and proper to effectuate the Court's declaration.

## THIRD CLAIM FOR RELIEF

### (Continuing Trespass)

86. LADWP incorporates by reference the allegations in Paragraphs 1 through 72 above.

87. Defendants are responsible for Disposals and Releases of Hazardous Substances and other chemicals and contaminants into groundwater, the local water supply, surface and subsurface soils, and otherwise into the Environment in and around the Defendants' Facilities and surrounding areas, which has spread, commingled, and contaminated the Tujunga Well Field.

88. Defendants are thus responsible for conduct that constitutes trespass.

89. As a result of these trespasses, LADWP has incurred Response Costs and other damages to investigate and to remediate the Hazardous Substances and other contaminants at the Tujunga Well Field.

90. LADWP will continue to incur damages until the trespasses set forth herein are abated.

## FOURTH CLAIM FOR RELIEF

**(Continuing Public Nuisance)**

91. LADWP incorporates by reference the allegations in Paragraphs 1 through 72 above.

92. Defendants are responsible for Releases at and from the Defendants' Facilities and surrounding property in violation of the law and public and private safety by improperly releasing, discharging, handling and disposing of Hazardous Substances and wastes at and around the Defendants' Facilities, as alleged herein, directly and proximately causing the Release of Hazardous Substances into the soil and groundwater. Those Hazardous Substances have migrated from the Defendants' Facilities and are now present in the groundwater underlying the Tujunga Well Field.

93. Defendants have known or should have known that Hazardous Substances were present in the soil and groundwater underlying the Defendants' Facilities. Nonetheless, Defendants have knowingly failed to abate the continuing nuisance and failed to prevent the migration of such contamination from the Defendants' Facilities to the groundwater beneath the Tujunga Well Field.

94. As a result of Defendants' conduct, Hazardous Substances and chemicals with dangerous health impacts have flowed and permeated underneath the Tujunga Well Field and surrounding properties, which has obstructed LADWP's ability to freely use the Tujunga Well Field, including by inhibiting LADWP's ability to use groundwater from the Basin to serve its customers—the

people of Los Angeles. Defendants have thus caused both a nuisance and a public nuisance under California Civil Code §§ 3479, 3480.

95. Releases of Hazardous Substances for which Defendants are responsible have migrated continuously to the Tujunga Well Field since they were released, further exacerbating the injuries to LADWP's free use of its land and water rights. Defendants' conduct has thus caused a continuing public nuisance.

96. LADWP has incurred and will continue to incur Response Costs and other damages to investigate and remediate the contamination for which Defendants are responsible. LADWP will continue to incur these costs arising from Defendants' nuisance until the contamination is abated.

## FIFTH CLAIM FOR RELIEF

**(Continuing Negligence)**

97. LADWP incorporates by reference the allegations in Paragraphs 1 through 72 above.

98. Defendants owed, and continue to owe, LADWP a duty of care.

99. Defendants are responsible for the conduct that caused soil and groundwater contamination at the Defendants' Facilities and surrounding properties, including the Tujunga Well Field. This contamination, as alleged above, constitutes a breach of Defendants' duty of care to LADWP.

100. Defendants have not abated this nuisance, and the contamination has migrated and continues to migrate from the Defendants' Facilities to the Tujunga Well Field.

101. As a result, LADWP has incurred and will continue to suffer damages and incur Response Costs to investigate and remediate the Hazardous Substances and other contaminants to abate the continuing nuisance.

**SIXTH CLAIM FOR RELIEF**

**(Negligence Per Se)**

102. LADWP incorporates by reference the allegations in Paragraphs 1 through 72 above.

103. Defendants and/or their predecessors intentionally, recklessly, and/or negligently caused the intrusion of Hazardous Substances and other chemicals into the Tujunga Well Field, which is owned and possessed by LADWP.

104. LADWP never gave Defendants or their predecessors permission to Release Hazardous Substances into the groundwater that migrated to the Tujunga Well Field. Nor did LADWP ever consent to or permit the migration of Hazardous Substances from the Defendants' Facilities to the Tujunga Well Field.

105. This conduct, for which Defendants are legally responsible, constitutes violations of California Water Code §§ 13050(m) and 13350, California Health & Safety Code §§ 5411.5, 25189(c)-(d), 25359, *et seq.*, 25100, *et seq.*, 11755, and 25249.5 (the Safe Drinking Water and Toxic Enforcement Act of 1986), California Fish and Game Code § 5650, and California Civil Code §§ 3479, 3480. These provisions set forth the standard of care and conduct intended to protect LADWP, the Tujunga Well Field, and all people and property of the general public at large from the type of conduct engaged in by Defendants and/or their predecessors. Defendants are thus responsible for such conduct and violations of these provisions and are thus liable for negligence *per se.*

106. Because of the actions of Defendants and/or their predecessors, LADWP has suffered damages and been harmed in several ways, including by incurring Response Costs to investigate and remediate the groundwater contamination and by being deprived of the ability to capture potable groundwater to serve Los Angeles residents without expensive remediation efforts.

**REQUEST FOR RELIEF**

WHEREFORE, LADWP prays for judgment against Defendants as follows:

1. For a judgment that Defendants are jointly and severally liable to LADWP, without regard to fault, for all Response Costs incurred by LADWP and resulting from Release and/or threatened Release of Hazardous Substances at or migrating to the Tujunga Well Field;

2. For a declaration that Defendants are jointly and severally liable to LADWP, without regard to fault, for all future costs, incurred by LADWP as a result of any release(s) and/or threatened release(s) of Hazardous Substances at or migrating to the Tujunga Well Field;

3. For LADWP's attorneys' fees and costs of suit;

4. For prejudgment interest; and

5. For such other and further relief as the Court deems just and proper.

Dated: September 28, 2026

*/s/ William D. Marsh*
WILLIAM D. MARSH (SBN 200082)
THOMAS A. BLOOMFIELD (SBN 163533)
KAPLAN KIRSCH, LLP
One Sansome Street, Suite 2250
San Francisco, CA 94104
Tel: (415) 907-8704
Email: wmarsh@kaplankirsch.com
Email: tbloomfield@kaplankirsch.com

HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
VALERIE FLORES, Chief Assistant City Attorney (SBN 138572)
MELANIE A. TORY, Assistant City Attorney (SBN 252387)
NICHOLAS J. Karno, Deputy City Attorney (SBN 210805)
221 North Figueroa Street, Suite 1000
Los Angeles, CA 90012
Tel: (213) 367-4500
Email: melanie.tory@ladwp.com
Email: nick.karno@ladwp.com

*Attorneys for Plaintiff The City of Los Angeles,*
*Acting by and through its Department of Water and Power*